# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00227-CV

---

**Roger Borgelt, Mark Pulliam, Jay Wiley, and The State of Texas, Appellants**

**v.**

**Austin Firefighters Association, IAFF Local 975; City of Austin; and Spencer Cronk, in his Official Capacity as the City Manager of the City of Austin, Appellees[1]**

---

### FROM THE 419TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-16-004307, THE HONORABLE JESSICA MANGRUM, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This appeal arises from a constitutional challenge to a provision of the 2017-2022 Collective Bargaining Agreement (Agreement) between the City of Austin and the Austin Firefighters Association, Local 975 (Association). The challenged provision provides a shared bank of paid leave ("Association Leave") for City firefighters to use for Association activities, subject to contractual requirements and restrictions on its use. Taxpayers Mark Pulliam and Jay Wiley initiated the challenge to this contractual provision on the ground that it violates Article III, Sections 50, 51, and 52(a), and Article XVI, Section 6(a) of the Texas Constitution (collectively, the "Gift Clauses"), asserting that it is an unlawful transfer of public funds to a private entity. The State of Texas intervened in the lawsuit in support of the taxpayers' challenge.

---

[1] The Court has substituted the City of Austin's current City Manager, Spencer Cronk, for his predecessor, Marc A. Ott. *See* Tex. R. App. P. 7.2(a).

The Association moved to dismiss Pulliam and Wiley's claims against it pursuant to the Texas Citizens Participation Act (TCPA), and the trial court granted the motion. *See generally* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011; *see also In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding) ("The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits."). Taxpayer Roger Borgelt later joined the lawsuit, and Pulliam and Wiley nonsuited their remaining claims against the City and its city manager, acting in his official capacity (collectively, the "City"). After a partial summary judgment and a subsequent bench trial, the trial court entered a final judgment denying Borgelt's and the State's claims against the City. Pulliam and Wiley appeal from the trial court's order granting the Association's TCPA motion to dismiss their claims against it, including the trial court's award of sanctions, while Borgelt and the State appeal from the final judgment.

For the reasons that follow, we will affirm the trial court's final judgment.

**BACKGROUND**

The procedural background of this case is complex. We briefly summarize the trial-court proceedings that are relevant to this appeal. In September 2016, Pulliam and Wiley filed suit against the Association and the City, seeking injunctive relief and a declaratory judgment that Article 10 of the collective-bargaining agreement in place at that time between the Association and the City is unconstitutional. Pulliam and Wiley asserted that Article 10, which establishes a bank of shared leave that may be used for Association activities, violates the Texas Constitution's "Gift Clauses." *See* Tex. Const. art. III, §§ 50, 51, 52(a); *id.* art. XVI, § 6(a). In October 2016, the State of Texas filed a plea in intervention, asserting the same claims as Pulliam and Wiley. In

November 2016, the Association filed a TCPA motion to dismiss. After a hearing in January 2017, the trial court dismissed Pulliam and Wiley's claims against the Association.

In November 2017, after some intervening appellate proceedings that are not relevant to the claims at issue in this appeal, Pulliam and Wiley repleaded their claims against the City, based on the 2017-2022 Agreement.[2] The amended petition and application for injunctive relief continued to name the Association as a defendant. Pulliam and Wiley acknowledged in the amended petition that the Association had been dismissed on its TCPA motion but stated that the Association remained listed in the amended petition "for the sole purpose of preserving Plaintiffs' appeal under the TCPA once a final, appealable Order is entered by the Court." The State filed an amended plea in intervention based on the new 2017-2022 Agreement against only the City and nonsuited all its claims against the Association. In July 2018, the Association filed a plea in intervention, asserting that it should be allowed to defend itself as a named defendant from the same claims based on the same facts and seeking the same relief in the same proceeding that the trial court had previously dismissed. In August 2018, it filed its motion for an award of costs, attorneys' fees, other expenses, and sanctions, as allowed by the TCPA. On the same day, the City and the Association filed a joint motion for summary judgment. A few months later in December

---

[2] The other appeals that have been filed and resolved related to the underlying trial-court proceeding include the following: *Pulliam v. City of Austin*, No. 03-17-00131-CV, 2017 WL 1404745 (Tex. App.—Austin Apr. 14, 2017, order) (per curiam) (dismissing Pulliam and Wiley's interlocutory appeal from trial court's order granting TCPA motion to dismiss for want of jurisdiction); *State v. City of Austin*, No. 03-17-00131-CV, 2017 WL 4582603 (Tex. App.—Austin Oct. 11, 2017, no pet.) (mem. op.) (concluding that trial court did not rule on Association's TCPA motion to dismiss with respect to State's claims and that trial court's February 7, 2017 order granting Association's TCPA motion to dismiss did not operate as implicit denial of State's plea to jurisdiction); *City of Austin v. Pulliam*, No. 03-18-00306-CV, 2018 WL 3321197, at *1 (Tex. App.—Austin July 6, 2018, no pet.) (mem. op.) (granting City's unopposed motion to dismiss its interlocutory appeal from trial court's order denying its amended plea to jurisdiction).

3

2018, Pulliam and Wiley and the State filed a joint motion for summary judgment, and the City and the Association filed a joint cross-motion for summary judgment and opposition to Pulliam and Wiley and the State's motion.[3]  In July 2019, after the joint motions for summary judgment had been fully briefed and heard, the trial court granted in part the City and the Association's joint cross-motion for summary judgment "as to any claims related to the collective bargaining agreement itself and the terms therein, that are challenged in the Amended Original Petition and Application for Injunctive Relief and the First Amended Plea in Intervention of Texas."  The trial court denied in part the City and the Association's joint cross-motion for summary judgment "with regard to the implementation of such contract by the City of Austin."  The trial court denied Pulliam and Wiley and the State's joint motion for summary judgment.  On the same day it signed the summary-judgment orders, the trial court also signed orders granting Pulliam and Wiley's motion to strike the Association's amended plea in intervention, while granting the Association's request against Pulliam and Wiley for TCPA attorneys' fees in the amount of $115,250 and sanctions in the amount of $75,000.

In November 2019, Pulliam nonsuited his claims against the City.  In October 2020, Wiley and newly added plaintiff Borgelt filed a second amended petition and application for injunctive relief against the City.  In November 2020, Wiley nonsuited his claims against the City.

On March 8-9, 2021, the trial court conducted a bench trial on the remaining claim by Borgelt and the State concerning the City's implementation of the Agreement.  On March 24, 2021, the trial court issued a final judgment in favor of the City and Association on all of Borgelt's

---

[3] The City and the Association's joint cross-motion for summary judgment raised similar legal arguments as their initial summary-judgment motion but contained additional facts and also incorporated additional evidence, as well as their opposition to Pulliam and Wiley and the State's joint motion.

4

and the State's claims. The trial court made findings of fact and conclusions of law, which it subsequently amended. This appeal followed.

## THE CITY AND THE ASSOCIATION'S COLLECTIVE-BARGAINING AGREEMENT

The Texas Legislature has established:

> The policy of this state is that fire fighters and police officers, like employees in the private sector, should have the right to organize for collective bargaining, as collective bargaining is a fair and practical method for determining compensation and other conditions of employment. *Denying fire fighters and police officers the right to organize and bargain collectively would lead to strife and unrest, consequently injuring the health, safety, and welfare of the public.*

Tex. Loc. Gov't Code § 174.002 (b) (emphasis added). The Agreement notes in its Section 2, Purpose of Agreement, that "the citizens of the City of Austin have by referendum election chosen the Collective Bargaining Process as a fair and orderly way of conducting its relations with Austin Fire Fighters . . . ." The parties stipulated, and the Agreement provides, that the Association is the sole and exclusive bargaining representative for all Fire Fighters (as that term is defined in the Agreement) in the Austin Fire Department (AFD). The Agreement further provides:

> the Association has pledged to support the service and mission of the Austin Fire Department, to constructively support the goals and objectives of the Austin Fire Department, and to abide by the statutorily imposed no strike or work slowdown obligations placed upon it;
>
> . . . it is the intent and purpose of this Agreement to achieve and maintain harmonious relations between the parties, and to establish benefits, rates of pay, hours of work, and other terms and conditions of employment for all members of the bargaining unit and to provide for the equitable and orderly adjustment of grievances that may arise during the term of this Agreement . . . .

The provision challenged by the appellants is Article 10, Association Business Leave ("Association Leave Provision"). As will be discussed in more detail below, the Association Leave Provision establishes a pool of 5,600 hours of paid leave for the Association's President and other Authorized Association Representatives to use to conduct Association business under the conditions specified in Article 10.

## ANALYSIS

Appellants present two issues on appeal. First, Borgelt and the State assert that the trial court erred by determining that they were not entitled to relief on their claims against the City because the Gift Clauses prohibit the Association Leave Provision. Second, appellees Pulliam and Wiley (who nonsuited their remaining claims against the City) assert that the trial court erred by granting the Association's TCPA motion to dismiss against them and by awarding sanctions under the TCPA. We address each of these issues in turn.

## I. The Association Leave Provision Does Not Violate the Gift Clauses

In their first issue, Borgelt and the State assert that the trial court erred by granting judgment in the City's favor, based on their contention that the Gift Clauses prohibit the City from paying City employees to work for the Association "when the City does not control the activities of those employees, when those employees are not obligated to provide services to the City, and when those employees work primarily to advance the private interests of the [Association], not the public interests of the City." In response, the City frames the issues in terms of the trial court's rulings. First, the City asserts that Borgelt and the State have not established a genuine issue of material fact as to whether the bargained-for contract term that provides for a shared leave bank to the City's firefighters and that is subject to numerous rules, restrictions, and approval

6

requirements, constitutes an unconstitutional "gift" of public funds. Second, the City asserts that Borgelt and the State have not established that the trial court erred in reaching its bench-trial judgment determining that the challenged, bargained-for contract term, as implemented by the City, was not an unconstitutional "gift" of public funds.

### A. Standard of Review and the Law Governing the Gift Clauses

Borgelt and the State do not challenge any of the trial court's findings of fact or the sufficiency of the evidence supporting those findings. Instead, they challenge the trial court's legal conclusions supporting its summary judgment and the final judgment issued after the bench trial. We defer to unchallenged findings of fact that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When both parties move for summary judgment and the trial court grants one motion and denies the other, we review all the summary-judgment evidence, determine all issues presented, and render the judgment the trial court should have rendered. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). When a trial court's summary-judgment order does not specify the grounds relied on for its ruling, as is the case here, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life*, 128 S.W.3d at 216.

We review the trial court's conclusions of law de novo, and we may review the trial court's legal conclusions drawn from the facts found to determine the correctness of the conclusions. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). If we determine that a conclusion of law is erroneous, but the trial court rendered the proper judgment,

7

the erroneous conclusion of law does not require reversal. *Id.* To the extent our analysis requires us to construe the Agreement, interpretation of an unambiguous contract is a question of law that "we review de novo using well-settled contract-construction principles." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

The constitutional provisions that make up what the parties refer to as the "Gift Clauses" are Article III, Sections 50, 51, and 52(a), and Article XVI, Section 6(a). They provide as follows:

> The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State in aid of, or to any person, association or corporation, whether municipal or other, or to pledge the credit of the State in any manner whatsoever, for the payment of the liabilities, present or prospective, of any individual, association of individuals, municipal or other corporation whatsoever.

Tex. Const. art. III, § 50.

> The Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever; provided that the provisions of this Section shall not be construed so as to prevent the grant of aid in cases of public calamity.

*Id.* art. III, Section 51.

> [T]he Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever . . . .

*Id.* art. III, § 52(a).

> No appropriation for private or individual purposes shall be made, unless authorized by this Constitution. A regular statement, under oath, and an account of

8

the receipts and expenditures of all public money shall be published annually, in such manner as shall be prescribed by law.

*Id.* art. XVI, § 6(a). These sections are "intended to prevent the application of public funds to private purposes; in other words, to prevent the gratuitous grant of such funds to any individual, corporation, or purpose whatsoever." *Byrd v. City of Dallas*, 6 S.W.2d 738, 740 (Tex. [Comm'n Op.] 1928) (addressing, among other constitutional provisions, Article III, Sections 51 and 52, and Article XVI, Section 6).

The Texas Supreme Court, in a case interpreting Article III, Section 52(a), reiterated this prior holding that Section 52(a)'s prohibition on a grant of public money "means that the Legislature cannot require *gratuitous* payments to individuals, associations, or corporations." *Texas Mun. League Intergovt'l Risk Pool v. Texas Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002) (analyzing whether Section 52(a) was violated by Labor Code provisions that required multi-city workers' compensation risk pool to pay unclaimed death benefits into Texas Workers' Compensation Subsequent Injury Fund). It further explained that "[a] political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Id.*

In addition, the Texas Supreme Court explained, it has long been held that Section 52(a) "does not prohibit payments to individuals, corporations, or associations so long as the statute requiring such payments: (1) serves a legitimate public purpose; and (2) affords a clear public benefit received in return." *Id.* at 383-84. The Texas Supreme Court established a three-part test for determining whether a statute accomplishes a public purpose:

Specifically, the Legislature must: (1) ensure that the statute's predominant purpose is to accomplish a public purpose, not to benefit private parties; (2) retain public

9

control over the funds to ensure that the public purpose is accomplished and to protect the public's investment; and (3) ensure that the political subdivision receives a return benefit.

*Id.* at 384.

The parties dispute whether the test as set forth in *Texas Municipal League* requires us to analyze both whether the public payment is gratuitous and whether it serves a legitimate public purpose (using the three-part test), or whether it is enough to determine that the payment is not gratuitous. Although the Texas Supreme Court did not explicitly state the test as requiring a consideration of both factors, we note that it determined both that the payments at issue were not gratuitous and then considered whether the payments accomplished a legitimate public purpose with a clear public benefit received in return. *Id.* at 385. Accordingly, we will do the same in this case.

**B.      The Contractual Provision Is Not a Gratuitous Grant of Public Funds**

Our first inquiry is whether the trial court rightly concluded that the Association Leave Provision is not a gratuitous grant of public funds. As an initial matter, we note that although Borgelt and the State characterize Association Leave as a gratuitous grant of funds to the Association, no funds are ever paid directly to the Association. Instead, the Association Leave Provision establishes a mechanism by which firefighters are permitted to have paid time off to conduct Association business under the conditions specified in the Agreement.

When considering the constitutionality of a statute allowing pensions for firefighters and police officers, the Commission on Appeals in an opinion adopted by the Texas Supreme Court stated that if the pension provided for in the act "is a part of the compensation of such employee for services rendered to the city, or if it be for a public purpose," then it did not

10

violate the Gift Clauses. *Byrd*, 6 S.W.2d at 740. The court in *Byrd* did not analyze whether the pension scheme served a public purpose; instead, it considered whether the pension plan was part of the employees' compensation. *Id.* It noted that "[t]here is no reason why a city may not engage its servants and employees upon any terms of payment acceptable to both parties." *Id.* It determined that the statutorily authorized pension plan contemplated that the employees' compensation would consist of their agreed-upon salaries and their entitlement to participate in the pension fund. *Id.* The court held:

> When an officer or employee coming within the statute is employed and evidences his assent to the pension scheme, he thereupon has a binding contract with his employer for the stipulated salary and likewise to be "entitled to participate" in the fund upon the terms prescribed. The right to participate in such fund is therefore not a gratuity or donation in any sense. *It is as much a part of the agreed compensation as is the monthly stipend.*

*Id.* at 741 (emphasis added). Similarly, in this case, the Association Leave Provision was a bargained-for term of the 2017 Collective Bargaining Agreement, and the right for firefighters authorized by the Association to receive such leave was part of the agreed compensation provided for in the Agreement.

Borgelt and the State, however, assert in their reply that because Association Leave is set up as a bank of time that individual City firefighters can request and because Association President Nicks is allowed to use 2,080 hours of the Association Leave bank, Association Leave "is not compensation to all employees for services rendered, for them to use as they see fit." They contend that instead it is given to the Association for the Association to use as it sees fit. Moreover, they contend that because Association Leave may be used by the Association as it chooses, Association Leave is not "'sufficient consideration' for the 'performance of employment duties.'"

11

They further argue that Association Leave differs from the pension-plan participation that the court in *Byrd* concluded was "part of the compensation of such employee for services rendered to the city," 6 S.W.2d at 740, based on their assertion that it is given to the Association for Association business activities consistent with the Association's purposes, not to employees as payment for the performance of employment duties. In support of this line of argument, they also challenge the trial court's conclusion of law number four in which the court concluded that for the purpose of "analyzing contractual consideration, 'individual paragraphs of a contract are not separate and divisible contracts,'" quoting *Howell v. Murray Mortgage Co.*, 890 S.W.2d 78, 86-87 (Tex. App.—Amarillo 1994, writ denied) (citing *Pace Corp. v. Jackson*, 284 S.W.2d 340, 344 (Tex. 1955)).[4] Borgelt and the State argue that because they assert that only the Association Leave Provision is unlawful, that provision may be severed and the remainder of the contract may be enforced. However, the principle that an illegal contract provision may be severed does not answer the question of whether we should examine the contract as a whole to determine whether sufficient consideration exists for this Court to determine that the Association Leave Provision is not gratuitous.

As this Court has previously stated, "[a] basic principle of contract law is that one consideration will support multiple promises by the other contracting party." *Fortner v. Fannin Bank in Windom*, 634 S.W.2d 74, 77 (Tex. App.—Austin 1982, no writ) (citing, *e.g.*, Restatement (Second) of Contracts § 80(1) (1981)), and holding that summary-judgment proof established that bank's customer purchased bank's services of loan and of filing title papers in exchange for his promise to repay principal and interest). The Agreement between the City and the Association

---

[4] They do not challenge the trial court's finding of fact (FOF) number twelve, "The [Agreement] constitutes a bargained-for exchange of valid consideration on all sides."

governs the City's relationship with the Association, which the City recognizes in the Agreement "as the sole and exclusive bargaining agent for all Fire Fighters pursuant to Local Government Code Section 174.101." As the court noted in *Byrd*, "[t]here is no reason why a city may not engage its servants and employees upon any terms of payment acceptable to both parties." 6 S.W.2d at 740; *see also Morales v. Hidalgo Cnty. Irrigation Dist. No. 6*, No. 13-14-00205-CV, 2015 WL 5655802, at *4 (Tex. App.—Corpus Christi–Edinburg Sept. 24, 2015, pet. denied) (mem. op.) (holding that employment contract with term entitling employee to cash severance equal to employee's remaining compensation due for term of employment if terminated by public employer for any reason other than death or disability did not constitute gratuitous payment of public funds to employee). "Texas courts have long held that the performance of employment duties is consideration for the payment of benefits to employees under the terms of a contract, and therefore such payments are not unconstitutional gratuities." *Morales*, 2015 WL 5655802, at *3 (citing cases).

Here, in addition to the fire-protection services that the City receives in return for the compensation terms of the Agreement, including the compensation provided by the Association Leave Provision, the trial court had before it evidence both at summary judgment and at trial that the City receives additional consideration in the form of concessions by the Association. These concessions result in changes favorable to the City on matters otherwise governed by the civil-service provisions found in Texas Local Government Code Chapter 143.[5] These matters

_____

[5] Unchallenged FOF number four states, "The [Agreement] allows the City and the [Association] to agree on terms of hiring and promotion beyond those that are specified in Chapter 143 of the Local Government Code, which allows the AFD to hire and promote candidates based on more than just the candidate's test score." Assistant Fire Chief Aaron Woolverton testified that the City and the Fire Department benefit from several articles in the Agreement, including the hiring article, the promotions article, and the drug-testing article, among others, and that "there's

13

include hiring, promotions, disciplinary investigations, disciplinary appeals, allowing for differences in base wages based upon seniority, longevity pay, required certifications, required education, specialized assignments, the designation of personnel in certain positions with certain leave and pay levels, drug testing, and the ability to merge the Austin Fire Department with Travis County Emergency Services Districts. These terms favorable to the City are incorporated into the Agreement. In addition, as the trial court states in unchallenged finding of fact (FOF) number seven, "The [Association] pledged in the [Agreement] to support the service and mission of the AFD, to constructively support the goals and objectives of the AFD, and to abide by the statutorily imposed no strike or work slowdown obligations placed on it."

Borgelt and the State also argue that the Association "has not obligated itself to perform any duties, or give anything in return, for the [Association Leave] hours it receives." As explained above, "an individual paragraph is merely a part of an entire, integrated contract between the contracting parties. Mutuality of obligation in each individual clause of a contract is unnecessary where there is consideration given for the contract as a whole." *Howell*, 890 S.W.2d at 86-87 (citations omitted); *see also United Appliance Corp. v. Boyd*, 108 S.W.2d 760, 764 (Tex. App.—Fort Worth 1937, no writ) ("Generally there is mutuality in the case of mutual promises by both parties to the contract which furnish a consideration each for the other, or where both parties undertake to do something—even though every obligation of one party is not met by an equivalent counter obligation of the other."). Despite Borgelt and the State's assertion, and while an equivalent counter-obligation for Association Leave is not necessary, we note that the unambiguous terms of the Agreement in fact bind the Association to several specific obligations

---

others, where the City has—has gained rights that we wouldn't have had under a strict 143 standard, or our—our rule, and so we've gained in those . . . areas."

14

related to a number of administrative requirements, including administering the Association Leave bank, recordkeeping regarding membership and dues withholding, and communications with members of the Civil Service Commission and with its own membership. A key duty of the Association is its role in the grievance-resolution procedure established in the Agreement "to establish an effective method for the fair, expeditious and orderly adjustment of grievances." The Association Grievance Committee makes the initial determination of whether a valid grievance exists, and if it does, the Association moves the grievance forward through the process, which can include arbitration, on behalf of the firefighter. The Association also agreed to attempt to resolve grievances informally both before their filing and before arbitration "in an attempt to avoid costly arbitration."

In addition, Borgelt and the State's consideration argument presumes that because Association Leave may be used for Association activities that support the Association's business, the City does not benefit from these activities. As we will discuss in more detail below as it relates to public purpose, this argument ignores the benefits received by the City from the concessions noted above and the role that the Association plays in the Agreement's stated purpose of maintaining "harmonious relations between the parties," including providing "for the equitable and orderly adjustment of grievances that may arise during the term of this Agreement." The trial court made multiple unchallenged findings of fact that the public—on whose behalf the City negotiated the Agreement—benefits from "achieving and maintaining harmonious relations between public safety employees and local government" and from "[a]greeing to a method of equitable and orderly adjustment of firefighter grievances, as described in the Agreement." As the trial court's unchallenged FOF number six states, "Good labor relations between the City and the

15

[Association], including a duly negotiated and ratified labor agreement, are integral in AFD achieving its purpose, mission, vision, goals and core values."

Finally, there was uncontroverted evidence before the trial court that as part of the collective-bargaining process in 2009, the City agreed to the current method of allowing up to 5,600 hours per year of Association Leave in exchange for a change in the treatment of sick leave from "productive leave" that counted toward employees' hours worked for purposes of calculating overtime to "nonproductive leave" that did not count towards employees' hours worked. Nicks estimated that this change saved the City between $500,000 to $600,000 per year, while the cost of Association Leave is approximately $200,000 per year.

Both the Agreement's express terms and the record evidence support a conclusion that the Association Leave Provision is supported by sufficient consideration. This consideration renders the Provision constitutional on its face because the Agreement's grant to employees of the ability to take paid time off for Association Leave is not gratuitous. *See Texas Mun. League*, 74 S.W.3d at 384 (explaining that "only sufficient—not equal—return consideration" is required "to render a political subdivision's paying public funds constitutional"). Consequently, we hold that the trial court did not err by concluding in conclusion of law number ten that "[t]he [Agreement], containing the [Association Leave] article, is supported by an exchange of valid, bargained-for consideration on both sides." *See Byrd*, 6 S.W.2d at 741 (concluding that employees' right to participate in pension fund was part of agreed compensation for services); *see also Walker v. City of Georgetown*, 86 S.W.3d 249, 260 (Tex. App.—Austin 2002, pet. denied) (concluding, without conducting analysis of public purpose, that City's lease of portion of public park for batting-cage facility for $400 per month was not gratuitous donation of public funds because lease was supported by valuable consideration).

16

**C.** **The Agreement, Including the Association-Leave Provision, Serves a Legitimate Public Purpose and Affords a Clear Public Benefit in Return**

We turn now to the two-prong test for constitutionality to determine whether the trial court correctly concluded that the Association Leave Provision does not violate the Gift Clauses because it (1) serves a legitimate public purpose and (2) affords a clear public benefit in return. *See Texas Mun. League*, 74 S.W.3d at 383. We will consider the three-part test established in *Texas Municipal League* for whether the challenged payment serves a legitimate public purpose: (1) whether the Association Leave Provision's predominant purpose is to accomplish a public purpose, not to benefit private parties; (2) whether the City retains public control over the City's funds to ensure that the public purpose is accomplished and to protect the public's investment; and (3) whether the City ensures that it receives a return benefit. *See id.* at 384. We then will consider the somewhat overlapping second prong of the constitutionality question—whether the Provision affords a "clear public benefit received in return." *Id.* at 383.

**(1) The predominant purpose is to provide public employees with leave time that is used for purposes related to their public employment**

Borgelt and the State challenge the trial court's conclusion of law number eleven, which states that "[t]he [Agreement], including the [Association Leave] article and the City's implementation of [Association Leave] under the [Agreement], accomplishes a predominantly public purpose and is not predominantly a benefit to private parties." Borgelt and the State argue that the Association Leave Provision does not serve a public purpose because they contend that the Association, not the City or its taxpayers, is the predominant beneficiary of Association Leave. They contend that because the Association is a private labor organization, its "mission is to advance the private interests of its members," citing in support the City's discovery response in

17

which it states that "[t]he Association is an organization that represents firefighters to deal with the City as an employer concerning grievances, labor disputes and conditions of employment affecting those firefighters" and that "[a]ctivities by the [Association] in connection with Article 10 are those that support their role as an employee organization." In further support of this argument, Borgelt and the City contend that the predominant purpose of the Association Leave Provision is to allow firefighters to do "private union business, not the City's business," and that if all the activities done using Association Leave promoted public purposes, there would be no need for Association Leave because the City could just assign employees to further those purposes directly as part of their official duties.

This argument ignores the policy set forth by the Texas Legislature, as stated above, declaring that collective bargaining between a political subdivision and the designated bargaining agent for the political subdivision's firefighters is in the public interest—"Denying fire fighters and police officers the right to organize and bargain collectively would lead to strife and unrest, consequently injuring the health, safety, and welfare of the public." Tex. Loc. Gov't Code § 174.002(b). Borgelt and the State dispute the City's argument that the predominant purpose of the Agreement "is to secure safe and efficient fire safety and emergency services for the citizens of Austin, an unquestionable public purpose," contending that the City cannot argue that Association Leave Provision "is necessary or (even helpful to) achieving this purpose." At bottom, Borgelt and the State's argument is that because the AFD could exist without the Association Leave Provision, the Provision does not serve a public purpose.

Borgelt and the State's argument fails because Borgelt and the State ignore the fact that, as the trial court found, the Association's mission—facilitating good labor relations between the AFD and its public-servant employees, furthering professional standards for firefighters, and

18

promoting firefighter and public safety—overlaps with the mission of the AFD, and the two organizations' missions are not mutually exclusive. Thus, work done on behalf of the Association by firefighters who are using Association Leave not only furthers the mission of the Association but also furthers AFD's mission and public purpose of providing safe and efficient fire safety and emergency services. As the trial court summarized in its FOF number fifteen, the Legislature has determined that "[c]ollective bargaining and the establishment of 'expeditious, effective, and binding' contractual arbitration and enforcement procedures promotes the health, safety, and welfare of the public by ensuring 'high morale of fire fighters . . . . and the efficient operation of the departments.'"[6] In addition, as the trial court found in other findings of fact, the Association's business carried out on behalf of its public-servant employees serves a public purpose:

> 5. Employing a staff of individuals who are trained to effectively suppress fires and protect public safety is a public purpose.
>
> 6. Good labor relations between the City and the [Association], including a duly negotiated and ratified labor agreement, are integral in AFD achieving its purpose, mission, vision, goals and core values.
>
> 7. The [Association] pledged in the [Agreement] to support the service and mission of the AFD, to constructively support the goals and objectives of the AFD, and to abide by the statutorily imposed no strike or work slowdown obligations placed on it.

---

[6] *See* Tex. Loc. Gov't Code §§ 174.002(c) (establishing that "[t]he health, safety and welfare of the public demands that strikes, lockouts, and work stoppages and slowdowns of fire fighters and police officers be prohibited" and thus it is State's "duty to make available reasonable alternatives to strikes by fire fighters and police officers"), (d) ("Because of the essential and emergency nature of the public service performed by firefighters and police officers, a reasonable alternative to strikes is a system of arbitration conducted under adequate legislative standards [or judicial enforcement of this Chapter's requirements]."), (e) ("With the right to strike prohibited, to maintain the high morale of fire fighters and police officers and the efficient operation of the departments in which they serve, alternative procedures must be expeditious, effective, and binding."), .101 (establishing that "public employer shall recognize an association selected by a majority of the fire fighters of the fire department of a political subdivision as the exclusive bargaining agent for the fire fighters of that department").

. . . .

16. Achieving and maintaining harmonious relations between public safety employees and local government is a public purpose.

17. Agreeing to a method of equitable and orderly adjustment of firefighter grievances, as described in the [Agreement], is a public purpose.

We conclude that the Association Leave Provision's "predominant purpose is to accomplish a public purpose" because it facilitates the Association's ability to carry out its business of supporting the Fire Department's mission and maintaining good labor relations between the City and its public-servant firefighters.

### (2) The trial court correctly determined that the City retains sufficient control over the Association Leave Provision to ensure that the public purpose is accomplished and to protect the public's investment

Borgelt and the State contend that the Association Leave Provision violates the Gift Clauses because the City failed to establish that it maintains any control—either in the language of the Agreement or in its implementation—over the public funds used to provide Association Leave. They primarily focus on the use of the Association Leave granted by the Agreement to the Association's President and, to a lesser extent, on the use of Association Leave by other "Authorized Association Representatives," as that term is defined in the Agreement. Borgelt and the State do not challenge any of the trial court's findings of fact related to the issue of control. Instead, they assert that the terms of the contract and the evidence before the trial court support their contention that the City does not control its employees' use of Association Leave in an adequate manner to avoid violating the Gift Clauses.

20

We first consider how the Agreement and its implementation apply to the Association's President. Bob Nicks, the Association's President since 2010, gave testimony both by deposition and at the two-day bench trial. Borgelt and the State contend that the City does not maintain adequate control over the Association President's use of Association Leave because he is allowed to work full-time on Association business but is not required to report to AFD headquarters or any other Department office on a daily basis or to report to the City his daily activities or what Association work he is doing. They also argue that because he is outside of the regular chain of command and reports to the Chief of Staff or the Fire Chief and because the City cannot remove the Association President from his Association position, the City lacks sufficient control over the Association President's use of Association Leave.

We disagree that the City lacks sufficient control over the Association President and his use of Association Leave. The Agreement itself sets forth the parameters of what constitutes Association business activities for which Association Leave may be used. For the Association President, the Agreement provides that he may use up to 2,080 hours of Association Leave per year from the 5,600 hours in the Association Leave pool "for any lawful Association business activities consistent with the Association's purposes." The Agreement further states that the Association President "shall be assigned to a 40 hour work week. The Association President shall account for all leave time taken under such status through the Fire Chiefs office and such time shall be subtracted from the Association leave pool." Furthermore, "[a]t the end of his/her term, the Association President will be allowed to return to the assignment s/he occupied before commencing [Association Leave] to perform duties as Association President." Thus, the Association President remains a City employee who returns to his previous City position whenever

21

his term as Association President ends.[7]  In addition, the Agreement contemplates that the Association President may be required to return to duty at any time if an emergency situation exists and further provides that the Association President may also be assigned to special projects at the Fire Chief's discretion.  Assistant Fire Chief Aaron Woolverton, a member of AFD management, testified that the Association President is supervised by someone in the executive staff rather than a shift commander partly because the Association President works a more traditional schedule (40 hours from Monday through Thursday) than a shift commander who comes in only every third day and partly because of the difference in his job duties.

While Borgelt and the State contend that the City does not adequately control the Association President as an employee because "[t]he City cannot 'hire' him as [Association] President or remove him as [Association] President; it does not supervise him or his activities," this description misrepresents the City's level of control over the Association President.  While the City cannot choose who the Association's President is, the City controls his employment as an AFD employee, including retaining its ability to terminate his City employment, which would terminate his access to paid leave of any kind.  As Nicks testified and the trial court found, he remains subject to the Department's Code of Conduct and the City's and Department's personnel policies, and he may be disciplined by the City for failing to follow any of the City's policies or requirements.  Nicks testified that in fact he has been subjected to discipline from the Department for conduct during his Association Leave time.  The trial court also found that "Nicks is required to comply with continuing education requirements, EMT requirements, and any applicable

---

[7] The parties filed Amended Joint Stipulated Facts before the bench trial.  Borgelt and the State stipulated that "[t]he [Association's] President is Bob Nicks, who is employed as a full-time City of Austin firefighter."

22

credentials by the Austin/Travis County Office of the Medical Director, just as any other member of the AFD." The trial court found that the City is not aware of any instance where the Association President used leave for any activities prohibited by Texas Local Government Code Section 143.086, governing political activities, or by the Texas Ethics Commission. The trial court made a finding based on Nicks's uncontradicted testimony that Nicks spends many more hours per week than his forty hours of Association Leave on his work as Association President.

And contrary to Borgelt and the State's implication, while no one directs the Association President's day-to-day activities, the evidence showed that the City does not lack oversight over his work. He testified, and the trial court found, that he meets with various members of AFD's management on a regular basis, including the Chief of Staff, whom he reports to "[w]henever he asks me to," and similarly attends any meeting that the Fire Chief asks him to attend. As Nicks explained it, "[w]hat we do is we work on a lot of common things together that are—that are mutually beneficial to the Department." As an example, he described a project that he and the Fire Chief "worked many, many hours together on," along with civilian budget analysts to come up with the most desirable ways from the Association's membership's point of view to solve an overtime crisis due to a personnel shortage. He testified that because he went through the process of engaging the membership and stakeholders, the City was able to save three to four million dollars and minimize morale issues.

We next turn to Borgelt and the State's argument that the terms of the Agreement and the use of Association Leave by other Authorized Association Representatives violates the Gift Clauses because the City lacks sufficient control over the use of the Representatives' time. The Agreement defines an "Authorized Association Representative" as "a representative of the Association authorized by the Association's Executive Board to conduct business on behalf of the

23

Association" and sets forth specific parameters for their use of Association Leave time. The trial court found that any member of the Association may request to use Association Leave as an Authorized Association Representative. As provided in Article 10, they may use the time "for Association business activities that directly support the mission of the Department or the Association, but do not otherwise violate the specific terms of this Article." The Agreement defines "Association business" as "time spent in Collective Bargaining negotiations[,] adjusting grievances, addressing cadet classes during cadet training (with prior approval of the time and content by the Fire Chief, or his/her designee), and attending union conferences and meetings."

The Agreement limits the use of Association Leave for "legislative and/or political activities at the State or National level" to activities that "relate to the wages, rates of pay, hours of employment, or conditions of work affecting the members of the bargaining unit" and at the local level "to raising concerns regarding firefighter safety." The Agreement prohibits the use of Association Leave for "legislative and/or political activities that are sponsored or supported by the Association(s) Political Action Committee(s)"; "for legislative and/or political activities at the local, state, or national levels that are contrary to the City's adopted legislative program"; and for activities prohibited by Texas Local Government Code Section 143.086 (governing political activities) or by the Texas Ethics Commission.

The Agreement gives the City the right to specify in Departmental policy the "[a]dministrative procedures and details regarding the implementation of" Association Leave. The Agreement requires that the Authorized Association Representatives request Association Leave in writing and submit their requests to AFD headquarters support staff at least three days in advance. The trial court found that Assistant Chief Woolverton was the individual designated to review Association Leave requests for most of the period at issue in this case. Woolverton testified at

24

length about the approval process for Association Leave. The trial court made a number of findings supported by testimony from him and Nicks about the use of Association Leave by Authorized Association Representatives. The trial court found that AFD, through Woolverton and other members of AFD management, has denied Association Leave requests that are untimely or that do not comply with the Agreement's Leave Provision or that would interfere with the Department's operational needs. The trial court found that the City is not aware of any instance where Association Leave was used by an Authorized Association Representative for any of the expressly prohibited political or legislative activities. The trial court found that "[t]he City has and continues to monitor [Association Leave] usage by compiling quarterly [Association Leave] usage reports, which show the amount of [Association Leave] used and the general nature of the business that was conducted while the AFD firefighters used that leave."

The Agreement's Article 4 establishes that the City retains all its inherent rights to manage the Fire Department and its work force, including the right to discipline or discharge employees in accordance with Chapter 143 and the Agreement's terms. The trial court found that all AFD members are expected to comply with applicable personnel policies and AFD's Code of Conduct while they are out on leave, including Association Leave. The trial court made findings that the Association uses Association Leave for "other association business" that includes station visits; organizing and working third-party charity events; and the Fire Fighter Combat Challenge event, which promotes firefighter fitness and furthers the Department's mission of maintaining a healthy and highly performing workforce. The trial court also found that ensuring the first responders like AFD firefighters are physically fit serves a public purpose.

Borgelt and the State focus on what they describe as the "undefined, unaccounted-for category of time" of "other association business," which they assert represents the majority of

25

Association Leave used by Authorized Association Representatives. The record evidence does not support this characterization of "other association business" as "undefined" or "unaccounted-for." While the quarterly summaries of Association Leave provided by the City do not explicitly show the specific activity for each entry logged as "other association business," each Association Leave request requires that the requesting firefighter complete a "Purpose of Request" field, and this field is what the Association (who screens the request first) and then the City reviews when determining whether to approve the request as Association Leave.

The trial court concluded that "[t]he [Agreement], including the [Association Leave] article and the City's implementation of [Association Leave] under the [Agreement], permits the City to maintain sufficient public control over City funds to ensure they accomplish a public purpose and the public's investment is protected." It further concluded:

> [Association Leave] is a bargained-for provision of [an Agreement] that sets, among other things, the conditions of employment for the City of Austin's firefighters. The [Agreement], City policies, and in particular the rules and practices AFD follows in approving and accounting for the use of ABL by [Association] president Bob Nicks and other Austin firefighters provides sufficient control to ensure that the public purposes of the [Agreement] and the [Association Leave] provision are accomplished and to protect the public's investment.

Having examined the record and arguments de novo, we conclude that the trial court did not err in reaching these conclusions.

### (3) The City receives a return benefit

As we previously concluded in our discussions of consideration and public purpose, the City receives a return benefit from the Association Leave Provision, but we will summarize those benefits and some others here. The City presented evidence that the Provision was originally

negotiated in exchange for the way that certain sick-leave time was calculated, resulting in a cost savings for the City. There is also record evidence explaining some benefits to the Department from the work that Authorized Association Representatives may use Association Leave to do, including participation in a cadet-hiring oversight committee and a labor-management initiative that works to resolve issues in a proactive way. Assistant Chief Woolverton testified that the City benefited from having Association representatives attend dispute resolutions and grievance proceedings because the City prefers to work things out through a grievance process or dispute-resolution process instead of a lawsuit. In addition, Nicks testified that one of the benefits provided to the public from his full-time work as Association President is that through his regular contact with both AFD management and the Association's members, he is able to provide the Fire Chief with "the perspective of the rank and file" about what "helps or hurts morale" and that allows the Chief to make a more informed decision on important issues, including firefighter safety and operational issues. Woolverton testified that he viewed it as a benefit to the City to have the Association President spend his full-time work week on Association business rather than being a part-time president and also having a Battalion Chief position. He stated:

> [H]aving had it both ways during the history of my tenure with the Fire Department, I was much more at ease with him actually being full-time dedicated to the functions of the presidency, and the reason being is the firefighter safety issue. I don't want the Union Presidents focused on something other than the men and women that are serving for him. And if his mind is elsewhere while he's on duty, that's not a good thing. So I like, personally, the split function.

Woolverton further testified that at one point Nicks had requested to be able to continue to work in operations and also maintain his Association President job, but the Fire Chief had denied that request for the same reason—to avoid a conflict in his two roles. Finally, the City benefits from

the Provision because the Provision enables the Association to conduct its business, and the Association's business serves the public purpose of facilitating harmonious labor relations between the firefighters and the City. The record evidence, including the Agreement's terms, supports the trial court's conclusion that "[t]he [Agreement], including the [Association Leave] article and the City's implementation of [Association Leave] under the [Agreement] ensures that the City receives a return benefit, and the City receives a clear public benefit in return."

Accordingly, having reviewed de novo the Agreement's terms and the City's implementation of the Association Leave Provision, we conclude that the Provision satisfies the three prongs of the public-purpose test. *See Texas Mun. League*, 74 S.W.3d at 385.

### (4) The Provision affords a clear public benefit in return

As for the second prong of the constitutionality question (which somewhat overlaps with the third factor of the public-purpose test), the trial court also correctly concluded that the City has established that Association Leave Provision "benefits the public as a whole, and not merely a particular private interest." *See id.* As previously explained, the record evidence shows that the Association's business serves a public purpose, so the Provision serves a public purpose of facilitating harmonious labor relations between the firefighters and the City. And as the trial court found, "[g]ood labor relations between the City and the [Association], including a duly negotiated and ratified labor agreement, are integral in AFD achieving its purpose, mission, vision, goals and core values."

We conclude that the Association Leave Provision (1) serves a legitimate public purpose and (2) affords a clear public benefit received in return. *Id.* The trial court correctly concluded that neither the terms of the Provision nor the City's implementation of the Provision

28

violate the Gift Clauses. Therefore, we affirm the portion of the trial court's final judgment ordering that Borgelt and the State take nothing, dismissing their claims against the City with prejudice, and entering final judgment in favor of the City. We overrule Borgelt and the State's issue.

## II. The Trial Court Did Not Err by Granting the Association's TCPA Motion and Awarding Sanctions

In a multi-part issue, appellants Pulliam and Wiley challenge the trial court's rulings against them in connection with the Association's motion to dismiss brought under the TCPA. *See generally* Tex. Civ. Prac. & Rem. Code §§ 27.001-011. They assert that the trial court erred when it granted the motion to dismiss (1) by finding that the Association established that the action relates to the Association's constitutional rights, (2) by finding that Pulliam and Wiley failed to establish a prima facie violation of the Gift Clauses even though it later found that a fact issue existed requiring a bench trial, (3) by awarding sanctions against Pulliam and Wiley, and (4) by granting the TCPA order and sanctions in violation of their constitutional rights. The Association responds that Pulliam and Wiley's asserted arguments against the TCPA order are "imaginative, but fundamentally flawed."[8]

The Association filed its TCPA motion to dismiss on November 21, 2016. Although the Texas Legislature amended the TCPA in 2019, the prior version of the statute continues to control cases filed before September 1, 2019. *See* Texas Citizens Participation Act, 86th Leg., R.S., ch. 378, §§ 11-12, 2019 Tex. Gen. Laws 684, 687 (providing that amendments

---

[8] The City did not move for dismissal of Pulliam and Wiley's claims under the TCPA, so the City takes no position on appeal on this issue. Similarly, the State takes no position on the appellate issues raised by Pulliam and Wiley related to the trial court's orders on the TCPA motion.

apply to actions filed on or after September 1, 2019). Thus, all references to the TCPA in this opinion are to the version that applies to this dispute. *See generally* Texas Citizens Participation Act, 82nd Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961, 961-64 (codified at Tex. Civ. Prac. & Rem. Code §§ 27.001-011).

### A. Applicable TCPA Legal Standard

The TCPA "protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d at 584; *see also* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011. The TCPA provides this protection by means of an expedited motion to dismiss a suit that appears to stifle the defendant's exercise of certain protected rights, including the right of association. *In re Lipsky*, 460 S.W.3d at 584 (citing Tex. Civ. Prac. & Rem. Code § 27.003). Reviewing a TCPA motion to dismiss requires a three-step analysis. *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018). Under the first step, the party moving for dismissal must show by a preponderance of the evidence that the TCPA applies to the legal action that is the subject of the motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code §§ 27.003(a), .005(b). If the movant satisfies that burden, under the second step, the burden shifts to the nonmovant to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Finally, under the third step, if the TCPA applies and the nonmovant satisfies its burden of presenting a prima facie case, the burden shifts back to the movant to establish by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim. *Id.* § 27.005(d).

When determining whether a legal action should be dismissed under the TCPA, courts must consider "the pleadings and supporting and opposing affidavits stating the facts on

which the liability or defense is based." *Id.* § 27.006(a). We view the pleadings, affidavits, and evidence in the light most favorable to the nonmovant. *Warner Bros. Ent., Inc. v. Jones*, 538 S.W.3d 781, 801 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020). We review de novo issues of statutory interpretation when determining whether the TCPA applies. *See Youngkin*, 546 S.W.3d at 680. We also review de novo the trial court's ruling on a motion to dismiss, including whether the parties have carried their respective burdens. *Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 873 (Tex. App.—Austin 2018, pet. denied).

## B. The Association Carried Its Burden to Establish That the TCPA Applies to Pulliam and Wiley's Claims

Under the first step of the TCPA analysis, we consider whether the Association has demonstrated that the TCPA applies to this legal action. TCPA Section 27.005 provides that "a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of . . . the right of association." Tex. Civ. Prac. & Rem. Code § 27.005(b)(3). The TCPA provides its own definition of the "[e]xercise of the right of association": "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *Id.* § 27.001(2). Both in their TCPA motion and on appeal, the Association urges that the TCPA applies to the suit because Pulliam and Wiley's claims "relate to" the Association's members' exercise of the right of association as defined by the Act. Pulliam and Wiley argue that the trial court erred by determining the TCPA applies to this legal action because the lawsuit has not infringed, and cannot infringe, on any of the Association's constitutional or statutory rights.

As the Association argued in its motion, the heart of Pulliam and Wiley's claim is that Association Leave is used to further the interests of the Association rather than the City's

31

interests. In support of this claim, they alleged in their petition that the Agreement allows Authorized Association Representatives to use Association Leave for "time spent in Collective Bargaining negotiations[,] adjusting grievances, attending dispute resolution proceedings, addressing cadet classes during cadet training (with prior approval of the time and content by the Fire Chief, or his/her designee), and attending union conferences and meetings." All these acts are "communication[s] between individuals who join together to collectively express, promote, pursue, or defend common interests." *Id.* Thus, on its face, Pulliam and Wiley's pleading demonstrates, as the Association argues, that the case "relates to" the statutorily defined exercise of the right of association by the Association's membership. *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) ("When it is clear from the plaintiff's pleadings that the action is covered by the Act, the defendant need show no more.").

Pulliam and Wiley, on the other hand, contend that "this case does not impair [the Association's] communications *at all*" and that even if they received the relief that they requested in this case (an injunction against Association Leave), the Association's ability and right to communicate and to associate will be entirely unaffected. They argue that because they seek to stop only public funding of the Association's activities, not the activities themselves, the case does not implicate the Association's constitutional rights or statutory rights under the TCPA. Contrary to Pulliam and Wiley's argument that the TCPA does not apply because their requested relief would not impair the Association's communications at all, the Texas Supreme Court has made clear that we must "adhere to a plain-meaning, dictionary-definition analysis of the text within the TCPA's definitions of protected expression, not the broader resort to constitutional context" that Pulliam and Wiley advocate. *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 204 (Tex. App.—Austin 2017, pet. dism'd) (citing *ExxonMobil Pipeline Co. v. Coleman*,

512 S.W.3d 895, 898-902 (Tex. 2017)). To support their allegation that Association Leave serves a predominantly private purpose and therefore violates the Gift Clauses, Pulliam and Wiley's suit relies upon the "communications" made by Association members using Association Leave. Applying the plain meaning of the terms defined by the Act, we conclude that the Association met its initial burden to show by a preponderance of the evidence that Pulliam and Wiley's "legal action" "is based on, relates to, or is in response to" the Association's "exercise of the right of association." *See id.* at 205.

### C. Pulliam and Wiley Failed to Establish a Prima Facie Case for the Alleged Gift Clauses Violation

On appeal, Pulliam and Wiley assert that the trial court erred by granting the TCPA motion because it is logically inconsistent for the court to find "(a) that plaintiffs failed to present a prima facie case while simultaneously finding (b) that plaintiffs pleaded and produced evidence sufficient to deny defendants' motion for summary judgment and (c) ordering trial on the merits of plaintiffs' constitutional claims." Pulliam and Wiley do not refer to any "clear and specific" evidence that they offered in response to the TCPA motion to establish a prima facie case. In response, the Association asserts that Pulliam and Wiley did not carry their burden under this second step of the TCPA analysis and that the trial court's subsequent rulings based on different standards of review, different record evidence, and even different collective-bargaining agreements do not demonstrate that the trial court erred by finding that they failed to establish a prima facie case in response to the TCPA motion.

Pulliam and Wiley's burden to present a "prima facie case" "refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d at 590. It is the "minimum quantum of evidence necessary to support a rational

inference that the allegation of fact is true." *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (per curiam)). By legislative design, a TCPA motion must be filed very early in the life of a lawsuit, no later than the 60th day after the lawsuit is served. Tex. Civ. Prac. & Rem. Code § 27.003(b). And upon the motion's filing, "all discovery in the legal action is suspended until the court has ruled on the motion to dismiss," *id.* § 27.003(c), except that "the court may allow specified and limited discovery relevant to the motion," upon a party's or the court's own motion and on a showing of good cause, *id.* § 27.006(b).

In this case, the trial court granted Pulliam and Wiley limited discovery relevant to the TCPA motion. It ordered the Association to respond to requests for admissions and to produce documents identifying the number of hours of Association Leave used by persons under the Agreement. It ordered the City to produce a report showing how Association Leave was used by Association members, including the Association President, during the prior three years and to produce policies and procedures concerning the use of Association Leave. The trial court also ordered Association President Nicks to appear and testify in support of the Association's motion to dismiss at the hearing on the TCPA motion.

To successfully defend against the TCPA motion, Pulliam and Wiley needed to produce evidence sufficient *as a matter of law* to establish, if that evidence is not rebutted or contradicted, that the Association Leave Provision is gratuitous (i.e., the City does not receive return consideration) or that the Association Leave Provision (1) does not serve a legitimate public purpose and (2) does not afford a clear public benefit received in return. *See Texas Mun. League*, 74 S.W.3d at 383-84; *see also In re Lipsky*, 460 S.W.3d at 590 (explaining what evidence is required to establish prima facie case). Although Pulliam and Wiley's amended petition sets forth in reasonable detail the nature of their constitutional challenge, they did not provide clear and

34

specific evidence of a prima facie case of each element of that challenge as the TCPA requires. *See* Tex. Civ. Prac. & Rem. Code Section 27.005(c); *In re Lipsky*, 460 S.W.3d at 591 ("Because the Act requires [clear and specific evidence of each essential element], mere notice pleading— that is, general allegations that merely recite the elements of a cause of action—will not suffice. Instead, a plaintiff must provide enough detail to show the factual basis for its claim."). "[W]hile the trial court can and should consider the facts alleged in the pleadings in determining whether the nonmovant provided clear and specific evidence of a prima facie case of each essential element of its causes of action, the production of evidence in support of those allegations is also required." *Yu v. Koo*, 633 S.W.3d 712, 728–29 (Tex. App.—El Paso 2021, no pet.). Pulliam and Wiley provided no such evidence here.

Instead, the undisputed evidence presented at the hearing contradicted their allegations and established that both the Agreement and the Association Leave Provision were supported by valid consideration, served a public purpose, and afforded a clear benefit in return. Nicks testified about the specific "give and take" that occurred during the collective-bargaining process by which the City agreed to the pool of 5,600 hours of Association Leave (a cost of approximately $200,000 per year to the City) in exchange for the way sick time was calculated for purposes of overtime, a change that Nicks estimated saves the City $500,000 to $600,000 per year. In addition, the evidence established that (1) the activities performed by firefighters on Association Leave serves predominantly public purposes, (2) the City retains sufficient control over the Association Leave, and (3) the City receives a return benefit. Nicks testified about the work done by himself and by others on Association Leave to promote firefighter and public safety, to maintain harmonious relations between labor and management, and to support certain charities along with management—all predominantly public purposes. The evidence established that the City had

35

authority to review and reject Association Leave requests by Authorized Association Representatives and that any firefighter, including Nicks, using Association Leave remains subject to City policies and orders. Nicks testified that the Department could call him back to active duty at any time. The trial court also heard evidence of the return benefits received by the City of the change to the sick-leave calculation that saves the City money on overtime and of the overall benefit of harmonious labor relations, including the facilitation of collective bargaining (which the Legislature has recognized as serving the public interest). We hold that the trial court correctly concluded that Pulliam and Wiley failed to carry their burden to marshal clear and specific evidence to establish a prima facie case on each element of their claim. *See* Tex. Civ. Prac. & Rem. Code §27.005(c).

We are not persuaded by Pulliam and Wiley's argument that the trial court's ruling on the TCPA motion is inconsistent with the trial court's later rulings. Those later rulings on the City's pleas to the jurisdiction and the cross-motions for summary judgment were made years later. Subsequent rulings on different motions do not render incorrect the trial court's decision on the merits of the TCPA motion, which it decided based on the record before it at the time. *See* Tex. Civ. Prac. & Rem. Code § 27.006(a) ("In determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."). Pulliam and Wiley cite no authority, and we have found none, to support the proposition that the scope of our review after final judgment of the trial court's grant of a TCPA motion that dismisses part of a case should include not only the evidence before the trial court when it ruled on the motion, but also all evidence later adduced in the case. *Cf., e.g.*, *LMP Austin English Aire, LLC through Lafayette English Partner, LLC v. Lafayette English Apartments, LP*, No. 03-21-00219-CV, ___ S.W.3d ___, 2022 WL

4594495, at \*13 (Tex. App.—Austin Sept. 30, 2022, no pet. h.) (reviewing pleadings and affidavit when analyzing partial grant of TCPA motion that had occurred before final summary judgment); *Beving v. Beadles*, 563 S.W.3d 399, 404 (Tex. App.—Fort Worth 2018, pet. denied) ("In our review, we consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."). They do not point to any specific later-filed evidence to suggest that they established their prima facie case at the TCPA stage; they argue only that the later rulings are inconsistent with the earlier dismissal of their claim against the Association. But a denial of the City's pleas to the jurisdiction does not establish that the trial court found that Pulliam and Wiley provided clear and specific evidence of a prima facie case of each essential element of their claim against the City, much less their claim against the Association. Moreover, there is nothing logically inconsistent about the trial court's determining that Pulliam and Wiley failed to establish a prima facie case on each element of their claim at the TCPA stage but later in the case, after additional discovery, deciding that although the terms of the Agreement were not unconstitutional as a matter of law, Borgelt and the State had raised a fact issue on the implementation of the City's control.[9]

Because Pulliam and Wiley failed to carry their burden under the TCPA, we affirm the trial court's grant of the Association's TCPA motion to dismiss.

---

[9] Pulliam and Wiley also argue that the Association's July 2018 attempt to intervene in the lawsuit after they amended their petition to challenge the 2017-2022 Collective Bargaining Agreement (and left the Association as a named party, ostensibly to preserve their appeal) means that the trial court should not have granted the TCPA motion in 2017. We are not persuaded that the Association's attempt to ensure that Pulliam and Wiley were not allowed to seek the same relief from them as to a new agreement renders the trial court's 2017 decision wrong.

**D. Pulliam and Wiley Have Not Established that the TCPA Sanctions Award Constituted an Abuse of Discretion**

After the trial court granted the Association's TCPA motion to dismiss in February 2017, and following the various appellate proceedings and other proceedings in the trial court and an agreement by the parties to postpone the issue until after pending dispositive issues could be heard, the Association filed its motion for attorneys' fees and sanctions in August 2018. The Association sought attorneys' fees in the amount of $115,250 and sanctions in the amount of $230,500 (two times the amount of attorneys' fees sought). On April 19, 2019, the Association filed a notice of supplemental evidence in support of its motion for fees and sanctions, requesting that the trial court take into account in its award of fees that the Association had incurred over 19 additional hours of attorneys' fees responding to Pulliam and Wiley's December 2018 motion to reconsider the 2017 TCPA order and October 2018 threat to file a TCPA motion against the Association's motion for fees. With the notice, the Association submitted deposition testimony from Pulliam and Wiley that it asserted further supported its contention that Pulliam and Wiley undertook the lawsuit for political reasons and would not be deterred from similar conduct in the future without substantial monetary sanctions.

On May 1, 2019, the trial court heard the Association's application for attorneys' fees and sanctions under the TCPA.[10] On July 18, 2019, the trial court granted the motion and awarded fees in the amount of $115,250 and sanctions in the amount of $75,000. On appeal, Pulliam and Wiley challenge the trial court's award of sanctions as excessive and punitive. They further argue that no sanctions should be awarded but advocate that if this Court upholds some

---

[10] There is not a hearing transcript in the appellate record.

38

sanctions award, a nominal amount of sanctions would be a sufficient deterrent.[11]

The TCPA requires an award of costs, attorneys' fees, and sanctions when a motion to dismiss is granted:

> If the court orders dismissal of a legal action under this chapter, the court shall award to the moving party:
>
> (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require; and
>
> (2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.

Tex. Civ. Prac. & Rem. Code § 27.009(a). We review sanctions awards in TCPA cases for abuse of discretion. *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021). A trial court abuses its discretion if it acts "without reference to guiding rules and principles to such an extent that its ruling was arbitrary or unreasonable." *Id.* (quoting *Nath v. Texas Child.'s Hosp.*, 446 S.W.3d 355, 361 (Tex. 2014)). A trial court does not abuse its discretion when its sanctions award is based on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *see also Rich v. Range Res. Corp.*, 535 S.W.3d 610, 614 (Tex. App.—Fort Worth 2017, pet. denied).

Moreover, "the statute does not specify a particular formula, amount, or guideline for determining the sanctions amount other than to say that the amount is to be sufficient to deter the party who brought the legal action from bringing similar actions." *Tatum v. Hersh*, 559 S.W.3d

---

[11] Pulliam and Wiley do not contend that the attorneys' fees awarded by the trial court fail to satisfy the statutory requirement that the attorneys' fees are "reasonable." Tex. Civ. Prac. & Rem. Code § 27.009(a)(1).

581, 587 (Tex. App.—Dallas 2018, no pet.) (op. on remand). Thus, the TCPA "gives the trial court broad discretion to determine what amount is sufficient to deter the party from bringing similar actions *in the future*." *Kinney v. BCG Att'y Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012 at *11 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op. on reh'g) (emphasis added).

Pulliam and Wiley argue that the trial court abused its discretion because the record contains no evidence that they have ever filed a frivolous lawsuit or that they have indicated any intention to file a meritless legal action in the future. However, the trial court had before it evidence that neither Pulliam nor Wiley had read the collective-bargaining agreement that they were challenging before they filed suit against the Association. At his deposition, Wiley admitted that he still had never read either the 2015 or the 2017 Agreement and that he had no knowledge of the negotiations between the City and the Association. He further admitted that even more than two years into the litigation, he had never sought to research the substance of the negotiations. The Association argues that Pulliam and Wiley's failure to do this basic research provided evidence that they were willing to file politically expedient suits, regardless of whether those suits are meritorious.

The trial court also had before it evidence that both Pulliam and Wiley had motives for filing suit against the Association that go beyond their alleged concern as taxpayers. Pulliam testified that he "practiced labor and employment laws for many years and ha[s] written about public employee bargaining. I'm not a big fan of public employee bargaining." He further admitted that "as a matter of public policy I do not believe that public employee bargaining is beneficial to taxpayers or to, to democracy for that matter." In addition, Pulliam admitted to writing on his blog about "lawfare," the practice of "pursuing a political goal through the legal

40

system, either criminally or civilly, by, you know, indirectly accomplishing a particular end," although he does not consider this lawsuit to be lawfare. He also admitted to writing about the cost of a similar provision in a contract between the City of San Antonio and its public-employee union and admitted that "it's possible" he would file a similar lawsuit in San Antonio if he became a taxpayer there.[12]

Wiley admitted to using the lawsuit as publicity to support his political platform as a "fiscal conservative" seeking "union reform" and "right-to-work laws" in Texas. In 2016, when this suit was initially filed, and again in 2018, Wiley ran in the Republican primaries for seats in the Texas House of Representatives. Soon after the suit was filed in September 2016, Wiley sent an email blast about the suit to his political listserv of about 9,000 to 10,000 individuals, including members of the press, who had expressed interest in his campaign or "who politically may have been interested in supporting my campaign." The email contained a graphic of a "little thief running away with a bag of money," which Wiley selected himself, and stated that "[i]f we are victorious, not only will our tax dollars no longer be used for private union activities, it will send a strong message to the City of Austin that they are not above the law." Wiley also admitted to including information about his stance on "public spending" and the lawsuit on his campaign website when he first announced his candidacy. He admitted that he publicized the lawsuit because he "thought it would help [him] in [his] campaign." At the time of his deposition his campaign's Facebook page, which he created "to promote [his] political campaign," stated that "[i]n 2016, Jay

---

[12] The Court notes that, according to Borgelt's testimony at trial, he joined the lawsuit because Pulliam was moving out of Austin and asked if he would be interested in helping Pulliam pursue the case.

41

sued the City of Austin over its unconstitutional use of tax dollars to pay union members for political work."

While Pulliam and Wiley argue that the record contains no evidence that they have ever filed a frivolous lawsuit or that they intend to file a meritless lawsuit or another lawsuit against the Association in the future, "[i]t was the trial judge's prerogative to weigh this evidence along with all the other evidence in determining, as a matter of discretion, how large the sanction needed to be to accomplish its statutory purpose" of deterrence. *American Heritage Cap., LP v. Gonzalez*, 436 S.W.3d 865, 881 (Tex. App.—Dallas 2014, no pet.), *disapproved of on other grounds by Hersh v. Tatum*, 526 S.W.3d 462 (Tex. 2017). In addition to the evidence referenced above, both Pulliam and Wiley admitted that they had never been billed by or paid any money to the attorneys at the organizations representing Pulliam and Wiley in the lawsuit. Thus, absent any monetary sanctions awarded against them here, they have no personal monetary incentive that would preclude them from filing similar suits in the future. Moreover, the trial court could have considered the history of the litigation, including Pulliam and Wiley's unsuccessful delayed request for reconsideration of the TCPA order and their threat to file a TCPA motion in response to the Association's motion for TCPA attorneys' fees and sanctions. *See LMP Austin English*, ___ S.W.3d___, 2022 WL 4594495, at *18 (explaining that trial court may consider litigation's history and parties' conduct when awarding sanctions). Finally, the $75,000 award of sanctions is substantially less than the $230,000 requested by the Association and is also substantially less than the award of $115,250 in attorneys' fees. *See id.* (considering ratio of sanctions to attorneys' fees when determining whether sanctions award was abuse of discretion and holding award that was nearly equal to attorneys' fee award was not abuse of discretion).

Given the broad discretion provided by Section 27.009 and the conflicting evidence about potential deterrence, we conclude that the trial court did not abuse its discretion by determining that a $75,000 sanction was required to deter further similar actions by Pulliam or Wiley. *See* Tex. Civ. Prac. & Rem. Code § 27.009(a)(2); *ADB Int., LLC v. Wallace*, 606 S.W.3d 413, 446 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (upholding $125,487.50 TCPA sanction and citing *American Heritage Capital*, 436 S.W.3d at 881).

### E. Pulliam and Wiley Have Not Established That the TCPA Order Violates Their Constitutional Right to Bring This Lawsuit

Pulliam and Wiley argue that the TCPA order and the order granting attorneys' fees and sanctions against them violates their and their attorneys' First and Fourteenth Amendment rights and "upends the purpose of the TCPA." They contend that the sanctions order "punish[es] citizens for exercising their right to prosecute constitutional claims in court." They contend that we must examine the trial court's grant of attorneys' fees and sanctions after resolution of the TCPA motion to determine whether it is narrowly tailored to advance a compelling government interest, citing the United States Supreme Court's determination that the state of Virginia's interest in regulating traditionally illegal practices of barratry, maintenance, and champerty did not justify Virginia's prohibition of the activities of the National Association for the Advancement of Colored People. *See National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 428-29, 439 (1963). We disagree with Pulliam and Wiley that the TCPA's provision establishing that the prevailing party on a motion to dismiss is entitled to attorneys' fees and sanctions impinges on their or their attorneys' First and Fourteenth Amendment rights.

The TCPA's stated purpose is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to

43

the maximum extent permitted by law and, at the same time, protect the rights of a person to file *meritorious lawsuits* for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002 (emphasis added). The provision establishing a mandatory award of fees and sanctions is not imposed on parties before they may institute litigation, nor is it imposed on them if they meet their TCPA burden of establishing by "clear and specific evidence" the elements of their prima facie case so that they may avoid dismissal. *Id.* §§ 27.005(c), .009(1). Instead, after resolution of the motion to dismiss, the TCPA "shifts litigation costs from the prevailing party (who met its burden to show by a preponderance of the evidence that the legal action is based on, related to, or is in response to that party's exercise of protected rights) to the party that failed to meet its burden." *Memorial Hermann Health Sys. v. Khalil*, No. 01-16-00512-CV, 2017 WL 3389645, at *16 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. denied) (mem. op.). "Moreover, the TCPA includes a countermeasure that permits fee-shifting in the event a trial court finds that a motion to dismiss was frivolous or filed solely to delay." *Id.* (citing Tex. Civ. Prac. & Rem. Code § 27.009(b) and concluding that TCPA's fee-award provision is not unreasonable or arbitrary when balanced with statute's purpose and does not violate open-courts doctrine). We conclude that Section 27.009 does not preclude or even chill the exercise of a litigant's First or Fourteenth Amendment rights; instead, it shifts litigation costs after the litigant's claim is determined not to be meritorious.

We overrule Pulliam and Wiley's issue and affirm the trial court's TCPA order and its order awarding fees and sanctions against Pulliam and Wiley.

44

**CONCLUSION**

Having overruled the appellants' issues, we affirm the trial court's final judgment.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Kelly

Affirmed

Filed:   November 22, 2022